NOT DESIGNATED FOR PUBLICATION

No. 122,980

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CREATIVE CONSUMER CONCEPTS, INC. and ROBERT S. CUTLER,
*Appellants*,

v.

KANSAS DEPARTMENT OF LABOR and STANTON D. BARKER,
*Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed January 28, 2022. Affirmed in part and reversed in part.

*Julie J. Gibson* and *Michael D. Matteuzzi*, of Matteuzzi & Brooker, P.C., of Overland Park, for appellants.

*Adam M. Hall*, of Thompson-Hall, P.A., of Lawrence, for appellee Stanton D. Barker.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

PER CURIAM: This appeal arises from a long-standing wage dispute between Robert S. Cutler, the CEO of Creative Consumer Concepts, Inc. (C3), and Stanton D. Barker, a former C3 employee. The primary question presented is whether Barker is entitled to unpaid commissions earned for sales completed after his employment terminated. In an earlier appeal, we determined that Barker earned commissions under the Kansas Wage Payment Act (KWPA), K.S.A. 44-313 et seq., in keeping with the terms of his compensation agreement by contacting, screening, and delivering potential clients to C3 sales representatives, who were then responsible for completing the actual sales.

1

Because Barker had performed the contracted services before leaving C3, we held he had a right to receive commissions for sales occurring after his termination. See *Barker v. Kansas Dept. of Labor*, No. 114,199, 2016 WL 3202698, at *4-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1316 (2017) (*Barker I*). Upon our finding that the administrative law judge (ALJ), Kansas Department of Labor (KDOL), and the district court had erred in their conclusions of law, we reversed and remanded with directions to "determine the commissions due Barker under the 2011 agreement and enter an award to him for that amount along with such other relief as may be appropriate based on his wage claim and consistent with this decision." 2016 WL 3202698, at *6.

On remand, the ALJ held an evidentiary hearing and awarded Barker compensation plus interest for several disputed restaurant accounts totaling $198,673.58. Additionally, the ALJ held Cutler personally liable for the judgment. C3 unsuccessfully appealed this ruling to the Secretary of the KDOL and the district court.

C3 appeals these adverse decisions issued after our remand. Upon our independent review of the record, we affirm the judgment awarding Barker compensation and interest. However, we reverse the judgment holding Cutler personally liable for paying the compensation plus interest.

FACTUAL AND PROCEDURAL HISTORY

C3 is an integrated brand marketing agency that "sells inexpensive toy packages, such as crayons and small coloring books, to restaurants that give the items to patrons with young children." See *Barker I*, 2016 WL 3202698, at *1. Barker began working for C3 in 2009. His employment required him to scout new business for C3 and build relationships that led to sales. Barker and C3 consummated a written wage agreement in January 2011 that amended and extended a prior agreement, in which Barker received a base salary plus commissions equal to 5% of the "gross profit" from C3's sales to a

2

qualifying customer during the first year of the business relationship and 1% of the gross profit from sales during each of the next four years. The agreement defined the first year as "the first twelve months that product is actually shipped."

In July 2012, Barker met and exchanged emails with Cutler to discuss his future at C3. During those discussions, Barker asked for a draw or advance payment of commissions based on sales that were not yet completed. Cutler agreed to the draw, with the condition that Barker would return any portion of the draw not covered by completed sales should he leave C3. Barker decided not to take the draw, and informed Cutler he was leaving the company at the end of August 2012. Cutler directed Barker to work with an account manager at C3 to calculate projected sales for commissions owed to Barker. Two days before Barker's scheduled resignation date, he met with Cutler to discuss the unpaid commissions. Cutler refused to pay Barker any commissions after his departure and informed Barker he would have to come after him "'legally.'"

In January 2013, Barker filed an unpaid wages claim with the KDOL, alleging that C3 withheld his unpaid commissions. After an administrative hearing, the ALJ issued a written ruling denying Barker's claim, finding his "'at will'" employment status meant he had no right to receive wages after his voluntary termination of employment. Barker administratively appealed the ruling to the KDOL and petitioned for judicial review in the Shawnee County District Court, which issued a detailed memorandum decision affirming the ruling.

Barker appealed to our court, and we reversed the KDOL and district court after concluding that Barker earned commissions "by contacting and screening potential customers and delivering them to sales representatives." *Barker I*, 2016 WL 3202698, at *4-5. As a result, we held that Barker was entitled to compensation based on sales occurring after his employment terminated. See 2016 WL 3202698, at *4-5. We remanded the case for further fact-finding on the commissions owed.

3

On remand, the ALJ began by ordering the parties to submit briefs, stating that the panel's decision "directs that further factfinding occur to determine the amount of unpaid commissions claimant earned under the parties' 2011 agreement regardless of whether the commissions were payable after the employment relationship ended." Thus, the ALJ ordered Barker to

"explain[] with particularity each of the unpaid commissions he fully earned according to the parties' 2011 agreement. Each such separately claimed commission shall adequately identify the client in question, the claimant's actions performed in earning the commission, whether and when the commission became payable, and the amount of the commission due. Each such claimed commission shall also display the method by which it was calculated in keeping with the parties' agreement."

Similarly, the ALJ ordered C3 to

"identify and explain every point of contention it has with the claimant's allegations, specifically admitting or controverting each allegation it may choose. All of the claimant's allegations that are uncontroverted or are left unanswered shall be deemed admitted."

In March 2018, the ALJ appointed an accounting firm owned by Stanley H. House to prepare a report (House Report) detailing the gross profits generated by 26 clients identified by Barker for which he believed he was entitled to commissions.

In June 2018, Barker submitted a brief in support of his claim, detailing 19 clients for which he believed he was entitled to commissions. For each client, Barker either included supporting exhibits or asserted that C3 conceded he was entitled to commissions and argued that interest and a willfulness penalty also should be assessed. On the other hand, Barker conceded that he was not entitled to commissions for six other accounts addressed in the House Report.

4

C3 filed its brief in response which Cutler prepared with his attorney's assistance. In the brief, C3 admitted that Barker had performed services and earned commissions related to five of the disputed claims for a total of $14,787.21, but otherwise refuted Barker's claims for the remaining accounts. C3 also contested that interest or a willfulness penalty should be assessed.

After a prehearing conference, the ALJ ordered C3 to pay Barker the $14,787.21 for the uncontested portion of the unpaid wages that C3 acknowledged it owed. The ALJ noted in a written order that it would defer ruling on the interest for any unpaid wages until later.

In August 2018, C3 asked the ALJ to reconsider and set aside its prehearing order requiring payment of the admitted unpaid commissions. C3 asserted that it had made the previous admission in error. The ALJ denied the motion, noting that "given the attempted recanting of fact pleadings filed and verbally reinforced at conference by [C3's] designated representative, Robert Cutler, the ALJ will take that record into consideration for purposes of assessing his overall credibility should Cutler eventually testify at hearing." C3 promptly remitted the payment.

In October 2018 the ALJ conducted a two-day evidentiary hearing at which Barker was represented by legal counsel and Cutler represented C3. At the outset, the ALJ admitted in evidence numerous exhibits filed by the parties. During the hearing, Barker called several former C3 employees as witnesses who testified about their knowledge of certain accounts that Barker had worked on for C3. Cutler did not present any witnesses on behalf of C3.

Barker testified on his own behalf about his job duties and efforts at earning commissions for the disputed accounts. Barker also testified about discussions regarding unpaid commissions that he had with Cutler shortly before his employment ended. Barker

5

recalled a meeting where Cutler "made it clear that he didn't feel like he owed me any commissions." Barker specifically told Cutler "'I believe that you owe these to me legally,'" to which Cutler replied, "'If you believe that, then you're going to have to come after them legally to get them.'" Cutler did not testify at the hearing.

The ALJ issued an initial order awarding Barker compensation plus interest for most of the disputed accounts totaling $198,673.58. The ALJ assessed interest effective June 2016, the date when *Barker I* was remanded. The ALJ declined to assess a statutory willfulness penalty under K.S.A. 44-315(b), finding that C3 did not willfully or unlawfully withhold any unpaid commissions since there remained unresolved questions of fact about the amount of the commissions until the ALJ's current ruling. However, the ALJ ruled that Cutler was personally liable for the judgment under K.S.A. 2020 Supp. 44-323(b) since he knowingly permitted C3 to withhold the wages.

C3 appealed the ruling to the Secretary of the KDOL, whose designee affirmed the decision after finding it was legally and factually proper. C3 petitioned for judicial review of the KDOL's ruling, which was similarly affirmed by the district court. The district court also denied C3's motions to alter or amend the judgment or for a new trial.

C3 and Cutler appeal.

DID THE KDOL ERR IN AWARDING COMMISSIONS TO BARKER?

C3 contends the KDOL and district court erred in finding that Barker met his burden to prove that he was entitled to unpaid commissions for certain disputed accounts. C3 presents a two-fold argument. First, KDOL and the district court erroneously applied our court's prior decision by only requiring Barker to prove the amount of the commissions owed. Second, Barker did not present substantial evidence to show that he

6

earned the disputed commissions because he failed to show that his efforts "'ripened'" into actual sales.

We begin the analysis with our standards of review. The Kansas Judicial Review Act (KJRA) defines the scope of judicial review of state agency actions unless the agency is specifically exempted from application of the statute. K.S.A. 77-603(a); *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). On appeal, the burden of proving the invalidity of the agency action rests with C3 as the party asserting the invalidity. K.S.A. 77-621(a)(1).

We exercise the same statutorily limited review of the agency's action as does the district court. *Coma Corporation v. Kansas Dept. of Labor*, 283 Kan. 625, 628, 154 P.3d 1080 (2007). The KJRA outlines the specific grounds on which a court may set aside an agency determination, which include four bases identified by C3 in its appellate brief:

> "(4) the agency has erroneously interpreted or applied the law;
> "(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> ". . . .
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> "(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

7

*The ALJ and District Court Correctly Applied the Holding from* Barker I.

C3 invokes K.S.A. 77-621(c)(4) and (5), and contends the ALJ and district court incorrectly applied *Barker I* by determining that the panel held Barker "*had actually earned each commission claimed*," and thus believed that the KDOL only needed to "quantify" the commissions owed. Barker responds to this argument by citing the mandate rule and the law-of-the-case doctrine, arguing that *Barker I* conclusively held that "in every instance, Barker had done the required work and, thus, earned compensation under the agreement." *Barker I*, 2016 WL 3202698, at *5.

Whether a district court complied with a Court of Appeals mandate, and the proper interpretation of a mandate, are questions of law subject to de novo review. *Sierra Club v. Mosier*, 305 Kan. 1090, 1105, 391 P.3d 667 (2017); see also *State v. Collier*, 263 Kan. 629, 636, 952 P.2d 1326 (1998) (explaining how the mandate rule is essentially a subspecies of the law-of-the-case doctrine). To fully assess C3's argument, we must examine the *Barker I* decision.

In 2016, our court considered Barker's appeal of the district court's affirmance of the KDOL's ruling denying his claim for unpaid commissions. We noted the ALJ had denied Barker's claim "ostensibly because, as an at-will employee, he had been paid the compensation due him." 2016 WL 3202698, at *2. After unsuccessfully appealing this ruling to the Secretary of the KDOL and the district court, Barker brought an appeal to our court. In our opinion, we explained that "[t]he ALJ and the district court misconstrued two significant aspects of Barker's claim for commissions," which were that they:  (1) "incorrectly characterized the legal rights and obligations of the parties in an at-will employment relationship"; and (2) "incorrectly applied the provisions of the written 2011 compensation agreement." 2016 WL 3202698, at *3.

8

Next, we explained the concept of at-will employment, including that "[w]hen an at-will employment relationship ends, the employer remains obligated to pay the employee any compensation earned for work performed before then. In other words, the termination of the relationship does not extinguish the promise to pay for work already done. [Citations omitted]." 2016 WL 3202698, at *3. As a result, because Barker's compensation agreement was "silent" about whether he must remain an employee of C3 to receive commissions, our court concluded the ALJ made a material error of law when it rejected Barker's claim based on the idea that Barker needed to remain a C3 employee to be able to receive commissions under the agreement. 2016 WL 3202698, at *4.

In reaching this conclusion, we also noted "C3 has aided and abetted that misperception with a fast shuffle—it has argued about the way the commissions were to be computed as if that were the way they were earned." 2016 WL 3202698, at *4. Our court rejected C3's position, explaining that

> "*Barker carried out the performance he promised C3 in exchange for a commission by contacting and screening potential customers and delivering them to sales representatives*. That's what C3 hired Barker to do, and that's what the company agreed to compensate him for. *Barker earned the agreed-upon compensation—salary and an appropriate commission—at that point, all while he worked for C3*. The common meaning of 'earn' requires no more. The American Heritage Dictionary of the English Language, 561 (5th ed. 2011) (defining 'earn' as '[t]o gain . . . for the performance of service, labor, or work'); Merriam-Webster's Collegiate Dictionary, 391 (11th ed. 2003) (defining 'earn' as 'to receive as return for effort and esp. for work done or services rendered'). Barker was not required to perform any additional duty or service to be paid.

> "More importantly, C3's argument cannot be reconciled with the statutory definition of wages in K.S.A. 44-313(c). Wages represent compensation, including commissions, 'for services rendered by an employee.' *There is no dispute Barker rendered all the services C3 required of him*. C3, therefore, was likewise required to compensate him as it had promised. The Act requires precisely that. K.S.A. 44-314(a).

9

"In this case, the amount of a commission could not be fixed at the time Barker had earned it or, in the words of the wage payment act, rendered his service. And if a given lead Barker developed never ripened into actual sales, he wound up earning a commission of zero. *But in every instance, Barker had done the required work and, thus, earned compensation under the agreement.* That some of the commissions could be computed only after Barker had left his employment with C3 doesn't mean he failed to earn them in accordance with the 2011 agreement and the wage payment act." (Emphases added.) 2016 WL 3202698, at *4-5.

In its current appeal, C3 objects to the district court's interpretation of the mandate from *Barker I* as set forth in the court's memorandum decision affirming the agency's ruling. In particular, C3 had argued in its petition for judicial review that the ALJ "ruled incorrectly" because "[t]he sole and only issue before the Kansas Court of Appeals was the legal question of whether (*i.e.*, IF), in fact, [Barker] had fulfilled those responsibilities, he would be entitled to commissions on sales made after the date upon which he resigned from his employment with [C3]."

The district court expressly rejected C3's argument, finding that the panel's decision in *Barker I* "does not, as Plaintiffs suggest, leave any room for doubt as to whether the commissions were earned, but only instructs for a calculation of what those unpaid wages are." The district court further explained that "the Court of Appeals did find that Barker had earned his commissions. All that remained was for the KDOL to quantify those wage amounts on remand, and calculate interest or other relief that might apply." Finally, the district court stated, "it is Plaintiffs . . . who have misconstrued what the Court of Appeals actually held." We agree.

C3's framing of the question at issue in *Barker I* is not accurate because we were not addressing the question as a pure hypothetical the way C3 has continually claimed throughout this case. The ALJ's original ruling denying Barker's wage claim—that was reversed in *Barker I*—incorrectly concluded that his status as an at-will employee meant

10

he was not entitled to receive commissions after his voluntary termination. As we explained in *Barker I*, the ALJ erroneously reached this conclusion because Barker's compensation agreement only required him to "contact[] and screen[] potential customers and deliver[] them to sales representatives" to earn commissions, which were then calculated based on gross profits from actual sales. See 2016 WL 3202698, at *4. Thus, the panel concluded Barker should receive the unpaid commissions he earned for the services he rendered in contacting, screening, and delivering potential clients to C3 sales representatives.

One of C3's main concerns is that the appellate record in *Barker I* did not allow our court to make any factual determinations about Barker's performance on any disputed accounts. While it is true that the prior appeal only dealt with the legal issue of whether Barker was entitled to unpaid commissions despite his at-will employment status, our court was not required to make any factual findings regarding specific accounts to arrive at our legal conclusion. When we determined that Barker was entitled to unpaid commissions as a matter of law, the only appropriate relief was to remand the case for fact-finding since Barker's wage claim never got past that legal hurdle with the KDOL or district court.

Moreover, we are not persuaded that the ALJ or district court simply rubber-stamped Barker's claims without requiring proof that he actually performed services under the agreement to earn the disputed commissions. When the case returned on remand, the first order issued by the ALJ in November 2017 set out a briefing schedule and scheduled a prehearing conference. Reviewing the contents of that order and subsequent rulings issued throughout the case contradicts C3's assertion that the KDOL believed Barker only needed to "quantify" the unpaid commissions to show he was entitled to relief.

11

For example, the ALJ noted that our court's decision "directs that further factfinding occur to determine the amount of unpaid commissions claimant earned under the parties' 2011 agreement regardless of whether the commissions were payable after the employment relationship ended." As a result, the ALJ ordered Barker to "submit a brief that explains with particularity each of the unpaid commissions he fully earned according to the parties' 2011 agreement." The ALJ then set forth the facts Barker would need to establish for each disputed account, including: (1) "the client in question"; (2) Barker's "actions performed in earning the commission"; (3) "whether and when the commission became payable"; (4) "the amount of the commission due"; and (5) "the method by which [each commission] was calculated in keeping with the parties' agreement."

Months later, due to continuing discovery disputes, the ALJ issued a second prehearing order setting out a new briefing schedule and reiterating the scope of the remand. The ALJ again detailed the issues to be addressed in the parties' briefs, reprising the original prehearing order from November 2017. In another order issued about a month after a prehearing conference, the ALJ announced several "findings, orders and notices to govern the remainder of these proceedings." The "[f]indings by the Kansas Court of Appeals in this case that control its remand order include the following: 'Barker carried out the performance he promised C3 in exchange for a commission by *contacting and screening potential customers and delivering them to sales representatives*.' [*Barker I*, 2016 WL 3202698, at \*4.]" C3 acknowledged this finding in a subsequent pleading and again at the evidentiary hearing, adopting "contacting, screening and delivering" as the controlling standard for determining whether Barker was entitled to unpaid commissions on a disputed account.

Finally, in its written ruling awarding Barker unpaid commissions, the ALJ detailed the various ways Barker earned some of those commissions based on the evidence presented at the hearing. Importantly, the ALJ found that Barker failed to prove he earned commissions for several of the disputed accounts because he acknowledged

12

delivering them to a separate business entity known as "C4." Similarly, the ALJ found that Barker was not entitled to unpaid commissions for two other disputed accounts because he testified that he only performed "design services," which did not fall under the terms of his commission agreement.

In summary, the tribunals below did exactly what we ordered in *Barker I* by reviewing the evidence presented and determining which of the disputed accounts Barker delivered under his commission agreement. C3 may not continue to litigate whether or how Barker earned commissions under the 2011 agreement because we already answered that question in *Barker I*. See K.S.A. 60-2106(c) ("Such mandate and opinion, without further order of the judge, shall thereupon be a part of the judgment of the court if it is determinative of the action, or shall be controlling in the conduct of any further proceedings necessary in the district court."); *Collier*, 263 Kan. 629, Syl. ¶ 3 ("When a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.").

*The ALJ's Factual Determinations Are Supported by Substantial Evidence.*

C3 contends the ALJ erred in finding that Barker proved with substantial evidence that he was entitled to commissions. See K.S.A. 77-621(c)(7). It also argues that the ruling was unreasonable, arbitrary, and capricious. See K.S.A. 77-621(c)(8). As stated earlier, we review factual determinations under K.S.A. 77-621(c)(7) for substantial evidence "when viewed in light of the record as a whole." Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019).

Under the KJRA, "'in light of the record as a whole'" means

13

"that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

Under K.S.A. 77-621(d) we must take three steps to determine whether substantial evidence supports the KDOL's ruling: (1) review both the supporting and conflicting evidence; (2) examine the presiding officer's credibility determinations; and (3) review the explanations given by the ALJ about why the evidence supports the agency's decision. See *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). Under this standard, we may reject a factual finding only if the agency's decision has been so undermined by other evidence that it is insufficient to support the agency's decision. *Schneider v. The Kansas Securities Comm'r*, 54 Kan. App. 2d 122, 149, 397 P.3d 1227 (2017).

At the outset, while the ALJ found Barker was entitled to unpaid commissions for 10 disputed accounts, on appeal, C3 only challenges the unpaid commissions on 5 of those accounts. In particular, C3's appellate briefing discusses the KDOL's awarding of commissions and interest for Captain D's Seafood Kitchen, Denny's, Dine Equity (Applebee's/IHOP), Pei Wei Asian Diner, and Texas Roadhouse. Because C3 does not challenge the awarding of commissions for the remaining accounts in this appeal, we deem those claims abandoned. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (issue not briefed is deemed waived or abandoned).

Regarding the five accounts C3 contests in this appeal, C3 generally contends that Barker failed to show he earned these commissions because he "failed to adduce any

evidence, much less substantial evidence," showing that his efforts directly "ripened" into actual sales. C3 also asserts that the evidence Barker provided lacks credibility upon which any reasonable person could rely to conclude that he earned those commissions. We will consider these arguments in our review of the five individual accounts.

1. *Captain D's Seafood Kitchen*

C3 asserts the only evidence Barker submitted supporting this claim "consisted primarily of making a few phone calls and eating at Captain D's on a few occasions," and that this evidence did not show "that anything [Barker] did resulted in actual sales." C3 emphasizes that Barker admitted he stopped communicating with Captain D's because they were undergoing a "brand exercise," and that the sales occurred nearly three years later.

Barker responds by noting that C3 downplays the evidence offered at the hearing, which is that Barker testified that he contacted, screened, and delivered this account, and that other former employees testified they believed Barker "'secured'" Captain D's business, and that his efforts led to the sales. Additionally, Barker asserts that C3 provided no detracting evidence and essentially asks us to discredit the witness testimony, an argument which Barker says "should fail under the immense weight of its own hubris."

The ALJ found in its initial order upon remand that the supporting evidence for this account included Barker's testimony, corroborating testimony from coworker witnesses, and documentation showing Barker's efforts in contacting and screening this prospect. Indeed, Barker testified that he contacted, screened, and delivered Captain D's to C3. He also submitted a "New Business Team Project Status" from September 2011, which showed several specific tasks he had completed.

Similarly, former C3 employee Alexis McGraw testified she was aware Barker secured Captain D's account by performing "initial prospecting" and "would then identify an opportunity for a pitch or a response to an RFP [request for proposal]." McGraw said Barker would work with C3 employees to prepare the pitch by "let[ting] us know recommended strategies for achieving the business [and] might show us competitive information . . . ." She also testified that she worked with Barker preparing a presentation for Captain D's, but that she did not participate in the presentation itself or close the sale. McGraw believed Barker secured the account by identifying the opportunity and participating in preparing the initial pitch. Elizabeth Coatney, another former C3 employee, testified she also helped pitch to Captain D's and that "Barker was a part of the team that went to pitch the new business for that account." Captain D's was one account that Coatney could "definitively recall" she and Barker worked on, and she believed Barker "opened the doors for those to come into C3." Another witness, Chrissie Mealy, a former C3 employee, testified that she and Barker "worked closely" because the new prospects he brought in "would typically transfer over to [her] team." Mealy recalled that Barker secured the Captain D's account for C3.

The only detracting evidence referenced by C3 is that the sales to Captain D's occurred almost three years after Barker's last contact, during which they were undergoing a "brand exercise." But Cutler also elicited testimony from Barker that such a "brand exercise" could "last anywhere between months to years."

The ALJ made no specific credibility findings for any of Barker's witnesses, but beyond calling Barker's evidence "self-serving and conclusory," C3 does not contest their credibility. Similarly, C3 does not identify any evidence that it submitted at the hearing to contradict any of the testimony or supporting documentation, and Cutler opted not to testify. All things considered, the majority of the evidence related to the Captain D's account supports Barker's claim for unpaid commissions. Based on the substantial evidence presented at the hearing, it was not unreasonable for the KDOL to find that

16

Barker contacted, screened, and delivered this account to C3 and thus earned the commissions.

2. *Denny's*

C3 contends Barker did not provide sufficient corroborating evidence to support his testimony that he contacted, screened, and delivered the Denny's account. As detracting evidence, C3 points to an email communication detailing a "chance encounter" between a Denny's contact and C3 employee—more than three years after Barker's resignation—that led to the eventual sales.

Barker responds by pointing out that the email in question was sent after Barker initiated his wage claim and calls it a "transparently self-serving attempt by C3 to 'document' the alleged (and un-dated) encounter." Moreover, Barker essentially contends that even if believed, this email shows only that the Denny's account was not secured "solely by Barker's efforts," which the ALJ found still entitled him to receive unpaid commissions.

For this account, the ALJ relied on Barker's testimony and corroborating documentary evidence which "includes business forms and consents that the client and C3 exchanged to formalize C3's vendor relationship with them." Barker testified about his efforts in earning the Denny's commissions and submitted a "Certificate of Liability Insurance" and a "Supplier Profile Questionnaire," prepared to allow C3 to become a vendor within Denny's system. He also testified "there were multiple touch points with Denny's" during his time with C3, and that in 2012 "things started heating up." Barker invited Denny's representatives to attend a conference sponsored by C3 that year, met with them, and "walked through capabilities, talked very high level with them, was in contact with their [chief marketing officer] . . . , [and] [w]orked with their VP procurement." Barker also helped create a "teaser" for Denny's and he turned over this

17

opportunity to a C3 sales representative when he left the company. Mealy testified that Barker secured the Denny's account for C3.

The detracting evidence mentioned by C3 is the email conversation between Cutler and Sharon Lykins, a director at Denny's. In an email dated May 10, 2016, Cutler wrote:

"Sharon,

"I asked Jennifer Loper this morning to remind me how we were so fortunate to become associated with the Denny's team and have this wonderful partnership.

"She reminded me again about meeting you at WFF and striking up a conversation about families. And of course I then remembered.

"You were kind enough to recognize our expertise and allow our team to come in and present our information.

"I wanted to personally reach out and thank you for your support and advocacy.

"The work we have done with Denny's is probably the finest of our 30 years. That only happens when a partner allows us to be our best versions of ourselves and truly respects and honors our commitment to being a great partner.

"We so appreciate the culture and partnership we have with Denny's and we have you to thank for that.

"On behalf of the 48 colleagues of C3 thank you again for the welcome gesture that has had such an incredible impact on our collective success.
"In gratitude,

"Bob."

Lykins replied:

"Wow. That has to be one of the nicest expressions of thanks l have ever received. I know the whole Denny's team has enjoyed working with your team. I agree with your assessment of the quality of the work that your team has produced. That chance encounter was beneficial to both parties.

"Your kind words are greatly appreciated."

Based on the evidence presented, we find that substantial evidence exists in the record to support Barker's claim for unpaid commissions for the Denny's account despite the detracting evidence provided by C3. The email conversation between Cutler and Lykins in May 2016 does not refute Barker's testimony that he began trying to contact and screen Denny's as early as 2009, which continued for several years until he delivered the account to a C3 sales representative upon his voluntary resignation in 2012. As we recognized in *Barker I*, Barker's compensation agreement provided that "depending on when the Department takes up the claim on remand, C3 may still have a continuing obligation to pay Barker commissions on *future sales*." (Emphasis added.) *Barker I*, 2016 WL 3202698, at *6. Thus, considering the ALJ's undisputed finding that Barker need not be the sole person involved in contacting, screening, and delivering an account, there is substantial evidence in the record to support Barker's claim that he earned these commissions because his efforts contributed to the eventual sales to Denny's.

3. *Dine Equity (Applebee's/IHOP)*

Regarding the Dine Equity account, C3 asserts that Barker's "self-serving and conclusory testimony . . . is belied by the documentary evidence submitted by C3." In particular, C3 identifies an email from a buying agent for Dine Equity reaching out to Cutler in March 2014 as the initial contact that led to eventual sales. In response, Barker

19

points to his testimony about his efforts to contact, screen, and deliver this account and the submission of documentary evidence corroborating those efforts.

For this account, the ALJ relied on Barker's testimony admitting that he was aware of a long business relationship with Dine Equity that had "'soured'" but his efforts "rekindled" the relationship. The ALJ found that Barker's testimony "that he contacted, screened, and delivered the account information to a sales representative of C3 [was] corroborated by some documents in evidence" and thus awarded him the unpaid commissions.

Barker testified that because he "re-engaged" with contacts for the account, his efforts "open[ed] the door" to future sales. C3 points out that Barker provided no documentary evidence to "demonstrate this vetting process," and that he was unfamiliar with members of the companies' respective purchasing departments. C3 also points out that the impetus for the specific sales to Dine Equity appeared to be a purchasing agent from the company reaching out to C3 requesting a sales pitch in March 2014.

While the evidence relating to this account was controverted, we find that substantial evidence exists in the record to support Barker's claim for unpaid commissions for the Dine Equity account despite the detracting evidence provided by C3. C3's documentary evidence does not entirely refute Barker's testimony that he "re-engaged" with Dine Equity and "opened the door" to future sales. Rather, substantial evidence supports Barker's claim for unpaid commissions because a reasonable person could conclude based on the evidence presented that Barker's efforts at reengaging with Dine Equity were a contributing factor to the eventual sales.

20

4. *Pei Wei Asian Diner*

C3 contends Barker testified "conclusively and without support" regarding his claim for unpaid commissions on the Pei Wei Asian Diner account. According to C3, the evidence Barker presented shows he only attempted to solicit Pei Wei, and that C3's evidence—again in the form of documented email exchanges—showed the sales only resulted from a separate business relationship another C3 employee developed with a former employee who later became the chief marketing officer at Pei Wei. Moreover, C3 points out that Barker testified he was screening Pei Wei "'from a digital standpoint,'" which fell outside his commission agreement.

Barker responds that C3 did not call any witnesses at the hearing to corroborate the facts set out in the email exhibits, and thus asserts that we should disregard this evidence. Moreover, Barker again contends this evidence does not contradict the conclusion that Barker's efforts contributed to the eventual sales. Lastly, Barker disagrees with C3's assertion that the Pei Wei account fell outside the scope of the commission agreement because the sales were for actual products and not digital services.

In assessing this account, the ALJ relied on Barker's testimony that he contacted, screened, and delivered the account information to a C3 sales representative, corroborating testimony from McGraw, and additional documentation in evidence showing Barker's efforts in contacting and screening this prospect.

Barker testified that as part of his screening process for Pei Wei, he met with Chris Epper and was looking to set up additional meetings in the future. These meetings were documented in an exhibit. Barker said he handed off the account because "we did some research about their guests because they weren't currently interested in product. So we were going down a digital route, website, if you will."

21

According to Barker, he met with representatives of Pei Wei in Arizona, "did a capabilities presentation with them [and] continued to follow up with them." Barker said Pei Wei "didn't know how a kid's program would fit into their current landscape, and we went down the path of a digital solution for them." He believed these efforts opened the door to future product sales to Pei Wei after he handed the account off to C3 sales representatives. Barker admitted, however, that selling digital services was not part of his commission agreement. For her part, McGraw testified that she was generally aware Barker prospected the Pei Wei account.

C3's detracting evidence is contained in several emails involving Jennifer Loper— a C3 employee—and Clay Dover. C3 asserts Dover was "a person with whom [Loper] had former business dealings when he was employed at C3." The record shows Dover worked for Raising Cane's from at least the time of Barker's resignation in August 2012 to April 2015, when he emailed Loper to advise her that he was leaving that company. Loper forwarded the email to Cutler, stating she predicted he would "end up somewhere really good which will translate into a good thing for us." Shortly thereafter, Dover emailed Cutler asking him for advice on his job search, which Cutler forwarded to Loper. Subsequently, Dover emailed Loper to inform her that he had accepted the chief marketing officer job for Pei Wei. About a month later, Dover emailed Loper and Cutler with the subject line "Pei Wei kids program," with the body of the email stating, "Start thinking about...." The next email Dover sent to Loper had the subject line "Kids Program RFP" and contained information for the proposal.

Based on the evidence presented, we find there was substantial evidence to support Barker's claim for unpaid commissions for the Pei Wei account. As with previous claims, the emails C3 relies on show only that Barker's efforts were not the sole contributing factor in the eventual product sales. Moreover, Barker's testimony and his corroborating documentation shows that he began working with Pei Wei regarding a program with children's product sales in mind, but Pei Wei was not interested at that

time, so Barker worked with them on a digital solution instead. A reasonable person could conclude that Barker's efforts working with Pei Wei fostered this business relationship for C3 and eventually contributed to the actual product sales. Thus, substantial evidence exists in the record to support Barker's claim for unpaid commissions on this account.

5. *Texas Roadhouse*

Regarding the Texas Roadhouse account, C3 previously admitted that Barker earned a "small" commission of $517.65 related to a Halloween order, and the ALJ ordered C3 to pay that amount. But C3 asserts the evidence shows Texas Roadhouse terminated its relationship after that sale in September 2012 and then C3 "rekindled" the relationship a year later, apart from Barker's efforts. In support, C3 cites email correspondence between C3 executives—including Cutler—and Texas Roadhouse.

Barker responds that the "natural legal conclusion" from C3's admission to the small commission is that he contacted, screened, and delivered this account to earn the remaining unpaid commissions. Barker contends C3 "attempts to divest Barker of his commissions by unilaterally modifying the employment agreement" to add a condition subsequent that Barker no longer receive commissions if a customer stops placing orders and then begins again. Barker also contests the reliability of the email provided by C3, suggesting it appears to be "partially redacted."

For this account, the ALJ relied on Barker's testimony that he contacted, screened, and delivered the account information to a C3 sales representative, corroborating testimony from coworker witnesses, and documents to show Barker's efforts in contacting and screening this prospect.

Barker testified that he believed he contacted, screened, and delivered the Texas Roadhouse account. His efforts made in securing business with Texas Roadhouse were documented on the "New Business Team Project Status" from September 2011. According to Barker, he made a presentation to Texas Roadhouse in March 2012. Barker also admitted in evidence some emails he exchanged with Cutler preceding this meeting.

According to McGraw, she was aware Barker secured the Texas Roadhouse account by performing "initial prospecting," identifying an opportunity for a sales pitch, and then helping other C3 employees prepare. McGraw also sent Barker an email in August 2012 before his departure "[t]o provide sales and profit numbers for accounts that he had won that [she] managed." Mealy testified that she recalled Texas Roadhouse as one of the accounts Barker secured for C3.

As detracting evidence, C3 points to emails exchanged between Texas Roadhouse employees and their counterparts at C3. On September 12, 2012, a Texas Roadhouse marketing employee emailed a C3 account manager, informing her that "we have decided to work with our long-time partner on our Kids and Family Marketing Program." The email also asked for an update on the status of the Halloween order. The two then exchanged messages of thanks and appreciation about the news and indicated they hoped the companies could partner again in the future.

About a year later, Shad Foos—C3's vice president—emailed several C3 employees, including Cutler, with the subject line "TXRH." The email began by referring to a "good call" with Texas Roadhouse and explained that they wanted "to have the full program and there are no terms in the current partner contracts." The email closed by stating "[w]e've established a bi-weekly call to start transition. It's looking positive." Just above that email is a partial redaction of another email, which Barker suggests is evidence of spoliation, that appears to state, "delete the copy from your system."

24

The next emails in the record between Texas Roadhouse and C3 employees were two months later in November 2013. In the initial email, Foos referenced a "great discussion" between Foos, Cutler, and Texas Roadhouse employees. Foos explained that the companies "are very culturally aligned and we know we can help move your business and your brand forward, so the next steps seem[] obvious." Foos expressed excitement about the opportunity. Later that evening, Cutler wrote, "Ditto on this end as well[.] Loved the exchange and connection. In my short 25 years I have only witnessed a culture as aligned a few times." The next morning, Chris Jacobsen of Texas Roadhouse responded to these emails writing, "Thanks for coming to see us. It was great to learn more about C3 and your culture, values, and business model. We look forward to 2013 and seeing where a partnership could take us."

We find that substantial evidence exists in the record to support Barker's claim for unpaid commissions for the Texas Roadhouse account despite the detracting evidence provided by C3. The emails upon which C3 relies show only that Barker's efforts were not the sole contributing factor in the eventual product sales. Moreover, for this specific account, C3 concedes that Barker sufficiently contacted, screened, and delivered Texas Roadhouse and was entitled to some unpaid commissions. Barker correctly notes that it would be inappropriate to read a condition subsequent into Barker's compensation agreement that a client's choice to stop doing business with C3 affected his ability to earn commissions. As we explained in *Barker I*, "[u]nder the agreement, Barker should receive commissions based only on completed sales *made during the specified 5-year period*." (Emphasis added.) 2016 WL 3202698, at *6. A reasonable person could conclude that Barker's efforts contributed to C3's successfully rekindled business relationship and that the sales fell within the terms of his compensation agreement. Thus, substantial evidence exists in the record to support Barker's claim for unpaid commissions on this account.

25

After reviewing the claims presented for the disputed accounts and considering all the evidence in light of the record, we find substantial evidence supported the KDOL's award of unpaid commissions and affirm the district court's ruling on that issue.

## DID THE KDOL ERR IN HOLDING CUTLER PERSONALLY LIABLE?

For his second issue on appeal, C3 argues the KDOL misapplied K.S.A. 2020 Supp. 44-323(b) by holding Cutler personally liable for the unpaid wages and interest.

At the conclusion of the hearing on remand, the ALJ found the "evidence establishes that Robert S. Cutler permitted the violation with full knowledge of the facts. Therefore, the facts and law require imposition of individual liability for the wages and interest." See K.S.A. 2020 Supp. 44-323(b) (If a KWPA violation is determined to have occurred, "[a]ny officer, manager, major shareholder or other person who has charge of the affairs" of the employer who "knowingly permits" the employer to violate the KWPA may be deemed the employer for purposes of this Act.). Consequently, the ALJ found both Cutler and C3 were jointly and severally liable for payment of the unpaid commissions and interest.

C3's issue presents a question of law. Since C3 argues that the ALJ improperly applied provisions of the KWPA, we must interpret the Act. Statutory interpretation presents a question of law over which appellate courts have unlimited review. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). In this regard, C3 states that we should defer to the KDOL's interpretation of the KWPA. However, we owe no deference to the agency's view. *May v. Cline*, 304 Kan. 671, 675, 372 P.2d 1242 (2016).

When interpreting a statute, we begin with its plain language, giving common words their ordinary meaning. If a statute is plain and unambiguous, we do not speculate about the legislative intent behind that clear text. But if the statutory language is

26

ambiguous, we consult canons of statutory construction to resolve any ambiguity. *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021).

The KWPA requires employers to pay "wages" due their employees. K.S.A. 2020 Supp. 44-314(a). "Wages" are defined as "compensation for labor or services rendered by an employee" and include amounts determined on a commission basis. K.S.A. 2020 Supp. 44-313(c). Under the statute, "[a]ny officer, manager, major shareholder or other person who has charge of the affairs of an employer, and who *knowingly* permits the employer to engage in violations of K.S.A. 44-314 or 44-315, and amendments thereto, may be deemed the employer" and be personally liable. (Emphasis added.) K.S.A. 2020 Supp. 44-323(b).

In the case on appeal, Barker had asked the ALJ to impose a statutory willfulness penalty under K.S.A. 44-315(b), which provides for a penalty the lesser of either "1% of the unpaid wages for each day . . . after the eighth day after the day upon which payment is required or in an amount equal to 100% of the unpaid wages," when an employer "*willfully* fails to pay an employee wages as required by K.S.A. 44-314, and amendments thereto, or as required under subsection (a) of this section." (Emphasis added.)

The ALJ declined to find C3's failure to pay unpaid wages was done willfully. The ALJ reasoned that our *Barker I* decision reversed the previous tribunals' endorsement of C3's legal arguments for not paying Barker, so C3 could not have willfully refused to pay the demanded conditions before the *Barker I* decision. As for the time following the *Barker I* decision, the ALJ did not believe C3 acted willfully in not paying the commissions because the *Barker I* decision left undetermined the actual amount of unpaid wages until the ALJ issued its ruling on remand.

The crux of C3's argument against Cutler's personal liability under K.S.A. 2020 Supp. 44-323(b) is that Cutler could not have "knowingly" permitted C3 to violate the

statute since the ALJ declined to find that C3 "willfully" violated the statute under K.S.A. 44-315(b). C3 argues that Cutler's good-faith belief that C3 owed no wages "negates" the knowing requirement and prevents Cutler from being held personally liable. According to C3, imposing personal liability on a corporate officer under K.S.A. 2020 Supp. 44-323(b) requires "something more than mere nonpayment of wages."

In response, Barker asserts that C3 fails to appreciate the difference between "willful" and "knowing" conduct under K.S.A. 2020 Supp. 44-323(b) and argues the ALJ correctly found that Cutler acted knowingly by allowing C3 to continue withholding unpaid wages after the *Barker I* decision. As both parties recognize, the Kansas Supreme Court has defined a "willful" act to mean "'one indicating a design, purpose, or intent on the part of a person to do wrong or to cause an injury to another.'" *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 411, 582 P.2d 244 (1978). But according to Barker, a "knowing" act is different, and he asks our court to interpret that term in accordance with the Kansas criminal law definition. See K.S.A. 2020 Supp. 21-5202(i) ("A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist.").

At the outset, although there was no willfulness penalty assessed against C3 under K.S.A. 44-315(b), the parties rely in part on decisions interpreting what it means for an employer to act "willfully." But it bears mentioning that a previous version of the statute differed in an important way. Before the legislative amendment, the ALJ could assess the penalty "[i]f an employer *knowingly* fails to pay an employee wages as required . . . except that such penalty shall apply only in the event of a willful violation." (Emphasis added.) See K.S.A. 44-315(b) (Furse 1993). The Legislature amended the statute in 1999 by changing "knowingly" to "willfully," and removing the "except that such penalty shall apply only in the event of a willful violation" language. L. 1999, ch. 69, § 1.

28

The significance of this change is that the cases interpreting the previous version of K.S.A. 44-315(b) seemed to distinguish between "knowing" and "willful" conduct but still referenced the terms together. See, e.g., *Holder*, 224 Kan. at 411-12 ("The evidence was adequate to support a finding by the jury that the employer had knowingly failed to pay and that the employer willfully violated the act."); *Benjamin v. Manpower, Inc.*, 3 Kan. App. 2d 657, 658, 600 P.2d 148 (1979) ("The general rule is that the determination of a knowing and willful failure to pay wages is a matter that is properly left to the finder of fact." [citing *Holder*, 224 Kan. at 411]). In the case on appeal, the ALJ's ruling also mentions that the penalty applies only "if an employer knowingly and willfully fails to pay wages when due."

But after the amendment, the Kansas Supreme Court's published decision interpreting K.S.A. 44-315(b) simply dropped the "knowing" reference without further substantive discussion. See *Coma Corporation*, 283 Kan. at 646 ("Whether an employer willfully failed to pay wages is a question of fact. [citing *Holder*, 224 Kan. at 411]"). It stands to reason there would be no appellate decisions discussing the difference between "knowing" and "willful" conduct after the amendment because K.S.A. 44-315(b) no longer requires an employer to act "knowingly."

Moreover, although a few published Kansas appellate decisions have interpreted K.S.A. 2020 Supp. 44-323(b), none discuss the requirement that a corporate officer act "knowingly" for them to be held personally liable for a judgment under the KWPA.

Barker suggests that "knowing" conduct is different than "willful" conduct and relies on *Beckman v. Kansas Dept. of Human Resources*, 30 Kan. App. 2d 606, 612, 43 P.3d 891 (2002). *Beckman* involved an employer's appeal of an unpaid wage claim in which the ALJ assessed the willfulness penalty. *Beckman* seems to suggest that "willful" conduct under K.S.A. 44-315(b) is different than "knowing" conduct under K.S.A. 44-323(b) because "proof of 'knowledge' alone is insufficient to give rise to any evidentiary

29

presumption of design, purpose, or intent." But the *Beckman* court's discussion of "knowing" conduct occurred entirely within the context of whether the willfulness penalty should have been assessed, i.e., not whether to impose personal liability on a corporate officer for unpaid wages. Beckman's personal liability was not in dispute, so the panel did not interpret any portion of K.S.A. 44-323(b).

This distinction matters because, as mentioned previously, the willfulness penalty statute in effect at the time required proof of both "knowing" and "willful" conduct by an employer. Now, it suffices for an employer's violation to be willful to impose a penalty under K.S.A. 44-315(b). In that way, Barker misconstrues *Beckman* as concluding that "knowingly" somehow means something less than "willfully." For its part, C3 asserts the two concepts are synonymous.

Contrary to both understandings, we are persuaded the two terms are independent of each other and describe conduct by different actors that leads to separate consequences under the KWPA. An employer who "willfully" commits a violation receives a statutory penalty, while a corporate officer who "knowingly" allows the employer to violate the law can be held personally liable for the resulting judgment—including any statutory penalty. See K.S.A. 44-315(b); K.S.A. 2020 Supp. 44-323(b). In other words, in our view, the presence of one type of conduct does not require the other, and both can also be present simultaneously.

What, then, does it mean for a corporate officer to act "knowingly" under K.S.A. 2020 Supp. 44-323(b) and, as a result, be subject to personal liability? C3 directs our attention to *Traffas v. Bridge Capital Investors II*, No. CIV. A. 90-1304 MLB, 1993 WL 339293 (D. Kan. 1993) (unpublished opinion), *aff'd* 46 F.3d 1152 (10th Cir. 1995). In that case, Traffas filed a breach of contract claim against his former employer after being informed that his "'for cause'" termination meant he would not be receiving severance pay. 1993 WL 339293, at *1-2. Although filed in federal court, Traffas also alleged a

30

violation of the KWPA and sought to hold Hoyt Goodrich—the president and director of his former employer—personally liable under K.S.A. 44-323(b). Of note, the statute in effect at that time differed slightly, but still required a corporate officer to act "knowingly" to impose personal liability on that individual. K.S.A. 44-323(b) (Furse 1993).

The federal court first observed that the statute did not define the term "'knowingly,'" but suggested that it "connotes an awareness by the officer that the wages are in fact owed." 1993 WL 339293, at *3. Thus, the court interpreted the statute "to require Traffas to prove not only that wages are owing, but that Goodrich refused . . . to authorize payment of the wages despite his knowledge that they were in fact due." 1993 WL 339293, at *3. The federal court further explained:

> "A contrary interpretation would render a corporate officer strictly liable every time the corporate employer was found to have violated K.S.A. 44-314 or 44-315 and would read the term 'knowingly' out of the statute. Such an interpretation would be at odds with established rules of statutory construction. The court agrees with the defendants that the mere fact that Traffas may have been owed wages does not impose liability on Goodrich. A good faith belief by a corporate officer that wages are not owed negates the 'knowing' requirement of 44-323(b). [Citation omitted.]" 1993 WL 339293, at *3.

The *Traffas* court also discussed our court's decision in *State ex rel. McCain v. Erdman*, 4 Kan. App. 2d 375, 607 P.2d 78 (1980)—the earliest published Kansas appellate opinion discussing K.S.A. 44-323(b). In that case, the claimant brought an unpaid wage claim after a corporate officer of his former employer issued checks for payment that were later dishonored for insufficient funds. We imposed personal liability on the corporate officer because the officer's conduct led to the corporation becoming indebted to the claimant. 4 Kan. App. 2d at 377-78.

31

The *Traffas* court determined this outcome was "consistent" with its own interpretation of the statute. 1993 WL 339293, at *4 ("The corporate officer in *Erdman* acknowledged he owed the wages on more than one occasion yet refused to pay the debt. This suggests that something more than mere nonpayment of wages is required to hold the corporate officer personally liable."). Distinguishing *Erdman*, the *Traffas* court declined to hold Goodrich personally liable because a "bona fide dispute" existed over whether the wages were owed, emphasizing in particular the fact that Goodrich was following the advice of the company's attorney. 1993 WL 339293, at *5-6.

Barker proposes that we adopt the meaning of "knowingly" under the Kansas criminal code, but we have previously found error in doing so in similar contexts. For example, in *Krauzer v. Farmland Industries, Inc.*, 6 Kan. App. 2d 107, 112, 626 P.2d 1223 (1981), we disapproved of a district court's reference to the statutory criminal definition of "'knowingly'" in the context of a workers compensation case because it "casts an undue burden of proof upon the employer in a civil case." Ultimately, the panel found no error in the district court defining "'knowingly'" to mean "'purposefully and intentionally and not accidentally'" because "[i]t is inherent in the term 'knowingly' that some degree of awareness be present." 6 Kan. App. 2d at 111, 113. We likewise decline to explicitly adopt the criminal definition and look elsewhere to determine what it means in the context of whether to apply personal liability under K.S.A. 2020 Supp. 44-323(b).

The dictionary defines "knowing" as "having knowledge or information" or "deliberate; intentional." Webster's New World College Dictionary 806 (5th ed. 2014). Similarly, Black's Law Dictionary defines "knowing" as "[h]aving or showing awareness or understanding; well-informed" or "[d]eliberate; conscious." Black's Law Dictionary 1042 (11th ed. 2019). Moreover, "knowingly" means "[i]n such a manner that the actor engaged in prohibited conduct with the knowledge that the social harm that the law was designed to prevent was practically certain to result; deliberately." Black's Law Dictionary 1042 (11th ed. 2019).

32

Collectively, these definitions reflect a similar interpretation adopted by the *Traffas* court that proving a corporate officer "knowingly" permitted a violation requires some proof of awareness by that officer that a violation had occurred or was occurring. Although the ALJ chose not to impose a willfulness penalty here, our Supreme Court has recognized an exception to K.S.A. 44-315(b) that is essentially the same as a "good faith belief" about a "bona fide dispute" discussed by the *Traffas* court. 1993 WL 339293, at *3-4. For example, in *Coma Corporation*, 283 Kan. at 646, our Supreme Court reiterated a long standing rule that "[w]here an 'honest dispute' arises over the amount of wages due, a statutory penalty will not be assessed against the employer." Although not explicitly stated in this way, C3 persuasively argues that this "honest dispute" exception also applies—or at a minimum, should be extended—to prevent imposing personal liability under K.S.A. 2020 Supp. 44-323(b).

As C3 asserts, imposing personal liability on a corporate officer simply because the employer is found to have violated KWPA by withholding commissions owed would read the term "knowingly" out of the statute. Unlike the corporate officer in *Erdman*, Cutler did not acknowledge that C3 owed Barker any of the disputed commissions. Rather, Barker's own testimony at the hearing was that "Cutler made it clear that he didn't feel like he owed me any commissions" and told Barker "'you're going to have to come after them legally to get them.'" Even after our decision in *Barker I*, it is not reasonable to conclude that Cutler "knowingly" allowed C3 to withhold unpaid commissions because the accounts and amounts still needed to be determined on remand. C3 was free on remand to contest the disputed commissions and was partially successful since the ALJ found that Barker was only entitled to commissions for some of the disputed accounts.

In summary, we hold the record does not support the findings by the ALJ and KDOL, and the district court's judgment, that Cutler was personally liable for knowingly permitting the violation of the KWPA. That is because there was a bona fide or honest dispute over what commissions were owed on various accounts and the amount of wages

33

due Barker. By failing to pay Barker the wages he was owed under his commission agreement, we held that C3 violated the KWPA. See *Barker I*, 2016 WL 3202698, at *6. But just as the ALJ recognized with respect to whether a willfulness penalty should be assessed, the proper amount of wages due was not known until the final ruling by the ALJ on remand.

In conclusion, we affirm the judgment of the district court and rulings of the ALJ and KDOL that awarded Barker commissions for the disputed accounts discussed herein. However, we reverse the judgment of the district court and rulings of the ALJ and KDOL that found Cutler personally liable for the judgment.

Affirmed in part and reversed in part.